ROBERT SELLICK, appellant,

*v.*

THERESA F. SELLICK, respondent.

[Argued May term, 1925. Decided May 19th, 1925.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Foster, who delivered the following opinion orally:

"I will dispose of this case now.

"This is an action brought for divorce by Robert Sellick, as petitioner, against his wife, Theresa F. Sellick, the defendant.

"The case has occupied a day and a half.

"The petition in the case was filed on the 1st of September, 1916, and charges that on the 5th day of December, 1911, the defendant deserted petitioner, and further charges that on the 27th or 29th of June, 1914, the defendant again deserted the petitioner and has willfully, continuously and obstinately continued this desertion to the present time.

"The original answer filed in the cause was a mere denial. For some reason, not satisfactorily disclosed, the cause has been allowed to sleep for about seven years; it was revived about a year ago, and a supplemental answer, together with a counter-claim, was then filed on behalf of the defendant, in which she repeated in the answer a denial of the charge of desertion on either or both of the dates named, and in her counter-claim, charges desertion on the same date, December 5th, 1911, and that this desertion has since been willful, obstinate and continuous.

"The parties were married in 1901, they had both been married before. The petitioner had four children by his former marriage; the defendant has none now living by

her former marriage. Two children were born of this marriage, one of whom now survives, a young lady about twenty, married herself.

"The petitioner is an engineer and architect. He testifies that without any justifiable cause defendant deserted him on the 5th of December, 1911, and continued that desertion against his will, and that on the 27th or 29th of June, 1914, he wrote her a letter urging her return, and that she refused to accept his invitation to return and make a home with him. Subsequently, in October and November, 1922, there was quite a voluminous correspondence between the parties in relation to the return of Mrs. Sellick to her home. Mr. Sellick states that in this correspondence are shown all the efforts that he made to have his wife return and live with him. It seems, according to the testimony, that at the time of his marriage Mr. Sellick was then working on a salary; that the family, as a result of his regular income, got along in a very happy, harmonious way for two or three years; that after that he undertook to go into business for himself as an architect, with the result of an attending uncertain, indefinite income; that their manner of life continued from that time not to be as happy nor as harmonious, nor was the provision which he was able to make for his family as satisfactory as it had been when he was working on a salary; conditions went from bad to worse, and some time about the year 1903 or 1904, at the request or suggestion of one or both of them—it is not clear which, I am inclined to think they were both responsible for it—and without any apparent means in sight to pay for it, they undertook quite some improvements or alterations to their home, which was owned by Mr. Sellick, and these repairs or improvements were allowed to go on and drag along, with the result that for eight years, according to Mrs. Sellick's statement, and for over a year, according to him, and for quite a period of time, according to the children, the house had been uncomfortable and was poorly equipped, and was badly supplied with food and provisions at times, and on occasions the family was without coal or any other means of heating the home; the gas had been cut off at times, and con-

ditions' of a generally uncomfortable character prevailed there, and continued to prevail for a considerable length of time prior to the separation of the couple in December, 1911.

"Apparently, the couple had a great deal of trouble from various causes. Petitioner claims that his work as an architect and engineer required him not only to be at his office in the daytime, but at night as well; that he worked as late as midnight, and sometimes later. He was at his home but very little of his time, except holidays and Sundays, and in the early morning before going to his office.

"Mrs. Sellick had some doubt, in the latter part of their association, as to whether his work and labors required all this midnight activity on his part, and about two or three months before they separated, that is about September or August, 1911, from information which she received from one of Mr. Sellick's daughters, or from some other source, she searched the pockets of his clothing, and she found there a poem, composed admittedly by him, and presumably either addressed or dedicated to a young lady, Miss Snyder, who was then in his employ. In this poem there is more or less ridicule or fun made about his wife, and this was said to have been done because the wife objected to the presence of Miss Snyder in his office, or her continued employment by Mr. Sellick, and, according to Mrs. Sellick, she had become so incensed over this employment that a few months before the separation she went to the office of Mr. Sellick and drove Miss Snyder therefrom by the use of an umbrella, about the same time that the poem was found and one or more letters were found addressed—I am not clear—I don't think the testimony is—whether the letter is addressed by Mr. Sellick to a married woman, or was addressed to Mr. Sellick from a married woman. Mrs. Sellick informed her husband of finding these papers, accused him of having improper relations with married women and with this young girl in his employ, with the result that one of their frequent quarrels occurred. They seemed to have the habit of quarreling frequently, apparently, for very little or no cause. Conditions did not improve because Mr. Sellick refused to give any explanation of the

poem or the letters, and stated that he was not going to be dictated to, and would select his friends and clients, and continued relations that he had already made. This culminated finally in the separation of the couple on the 5th of December following.

"Mrs. Sellick went to her brother and lived in Brooklyn for a while, and in Elizabeth for some time, and finally went back to Brooklyn. About three months after her departure she took possession of her child, Evelyn, and has since then remained away and has not lived with Mr. Sellick.

"Petitioner states that defendant left without any cause— I will come to that when I consider her branch of the case— and states that he had always treated her kindly, affectionately and considerately, although she and her witnesses state that he treated her with a total absence of affection and the utmost indifference, and barely spoke to her and gave her very little consideration. He states that the letters which he sent her to induce her to return, one of which I think is fourteen typewritten pages long, and the pages I should judge would be about three time the size of an ordinary sheet of legal paper, so that approximately one of the letters, in which he says is shown his efforts to have her return to him, would cover about forty-five or fifty typewritten pages of ordinary letter paper; the other letters cover three or four pages of these long sheets, typewritten, and these are the evidence of his efforts to have her return. The entire correspondence in relation to her return is in evidence, and from it is shown that as a condition for his acceptance of her return to live with him as his wife, petitioner demanded that the defendant should deny or withdraw or retract any and all statements, charges or accusations that she had made against either of the women that I have mentioned or referred to. I think this condition is imposed in every one of the letters he sent her, and it occurs sometimes repeatedly in some of them. It seems that shortly after the separation, in 1911, Mr. Smith, a member of the church to which Mr. Sellick belonged, was told by Mr. Sellick, when he attempted to effect a reconciliation, that Mr. Sellick would receive his wife back into

the home, and give her a home, but he would never receive her back as his wife. It also appears that he repeated that same statement to others, and it further appears that the parties met with counsel some time after the letter of June, 1914, was sent, soliciting her return, and in which the conditions already mentioned and referred to were embodied, and Mrs. Sellick then agreed to return the following Friday to her home, but she states that she learned in the meantime that Mr. Sellick had informed people, who told her, that he had only made the request to have her return, not because of a desire, but merely to get around the law. When that information came to her, she did not go to the home. It is admitted that when Judge Sweeney served the papers in this case, back in 1916, upon the defendant, who was then residing in Brooklyn, she told him she would prefer that Mr. Sellick would get the divorce rather than get one herself.

"Apparently, both parties contemplated a divorce for some time. Mr. Sellick upon the stand yesterday stated that in all the efforts he had made to have his wife return to him he had attached thereto certain conditions, namely, that if Mrs. Sellick was to return to his home as his wife, and live there with him, she would have to retract or deny her charges about these women that I have referred to, and in addition that she would have to lead a moral life, and be a chaste woman, although he admits that he never suspected her of being in any way immoral or unchaste, or doubted her fidelity to him, nor had he any grounds for it. He said she was reluctant to have intercourse; she denies it. He does not claim that she denied such rights to him, he says, in effect, that from December 5th, 1911, when they separated, until the present time, he had these conditions in mind as conditions precedent for her returning to his home as his wife, and that unless she complied he had no desire that she should return.

"That disposes of the element of obstinacy in his case. This woman did not remain away from him against his will. He was perfectly willing that she should remain away from him unless she complied with his commands or conditions,

which she finally agreed to do, in one of the letters—a letter which I think was written in March, 1918, and which he answered about three years later, in February, 1921. In this letter she stated that she would be willing to retract any accusation or any statement she had made against these women, and he stated that when he read that he became so disgusted with her that he didn't reply to her letter for nearly three years.

"There is absolutely no evidence showing good faith in his efforts to have her return and be reconciled to him, and I am absolutely convinced he never desired her to return.

"He refers to his religion and says his religious scruples caused him to have a sufficient regard for her, so that he did not press the divorce suit all these years. The children and friends have attempted to bring about a reconciliation. The daughter Evelyn says that she made an appointment with her father to receive the mother in order to talk over matters and be reconciled; that he agreed to meet the mother, and when the daughter prevailed and brought the mother to the home— the time is a little uncertain—quite uncertain—she found that the father, instead of meeting the mother as agreed upon, had gone to church; the mother and daughter had to wait at the home over three hours for his return. When he did return he refused to shake hands with his wife, and he greeted her with the remark, "What for is this; I see you are back," or some such expression. When he refused to take her hand and receive her in any way she left the home and has never been in it again. Possibly this may have been the same occasion, or possibly on another, when she called and asked him to go to church with her on Sunday and he refused to do it.

"I do not find from the proofs on his side of the case that the desertion was willful on her part, or that it was obstinate, in the sense of being against his will. There has been, of course, a continuous separation between the parties for more than the statutory period, but that single element alone is not sufficient to entitle him to a decree. The two other essential elements required by law, willfulness and obstinacy,

being lacking in the case, require me to deny his petition for divorce.

"Taking up her counter-claim, I find she had in the latter years of their relation a rather unfortunate and unhappy home. In some measure, possibly, she was responsible; if I believe her version, he was wholly responsible for the conditions. He does not deny the existence of any of the conditions that she complains of, and, even if he did, she is corroborated by his children and her own, and by the testimony of disinterested witnesses, visitors to the home, who all agree that at times there was not sufficient food; they all agree that in cold weather there was not sufficient fuel to make the home comfortable, several of them agree, or two or three at least, that it was his practice in the morning to throw a twenty-five-cent piece on the table by his wife's plate, and with this she was expected to furnish the food and provisions for the family during that particular day. That is testified to by his son and by his daughter and by some of his friends, by one at least, as well as by Mrs. Sellick.

"These conditions, lack of support and lack of comfort in the home, constant quarreling over financial and other matters, and the finding of the letters and the poem, and his refusal to give any satisfactory explanation, apparently affected her physically, and I am inclined to think that that the mental condition of Mrs. Sellick—she is a woman of apparently a very nervous temperament—the conditions mentioned aggravated her nervousness and affected and impaired her health, so much so that she consulted her brother, and on his advice she finally returned to her home and removed her effects. She had been working to support the family; she had baked bread; she had gone out to work, and her income was used for the support of the family to supplement that of the petitioner. I think the conditions at the home there and her suspicions of Mr. Sellick's relations with women and his refusal to give her what she regarded as a satisfactory explanation, although they may be, and probably were, wholly harmless, so worked upon her mind that she left him.

"I think after she left him she regretted it, and she showed a disposition to return to her home. That is quite apparent; she wrote him in various letters that she was willing to return and have everything in the past forgotten, and not to be referred to, as he had exacted, and after she had accepted his terms, by letter of March, 1918, he waited three years before giving her an answer, and then, when he gave her one, it was again to impose the same terms and conditions that he had in his former communications.

"I find she was justified in leaving him when she did; I find she was willing to return, and did return, to him, and would have remained with him if he had received her properly. No real and sincere effort to effect a reconciliation or for her return was ever made by him, and I am satisfied he did not want her to return and live with him as his wife.

"The proofs fully warrant that I should advise a decree in favor of the defendant on her counter-claim for a divorce on the ground of desertion. You may draw your order.

"On the question of permanent alimony, I will hear you at some other time, on notice."

*Mr. Algernon T. Sweeney,* for the appellant.

*Mr. Paula Laddy,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Foster.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON, KAYS, JJ. 13.

*For reversal*—None.